2022 UT 14

IN THE

# SUPREME COURT OF THE STATE OF UTAH

STATE OF UTAH,
*Appellee,*

*v.*

LETERRANCE TEWAYNE JOHNSON,
*Appellant.*

No. 20191024
Heard October 13, 2021
Filed March 1, 2022

On Direct Appeal

Third District, Salt Lake
The Honorable Linda Jones
No. 181911110

Attorneys:

Sean D. Reyes, Att'y Gen., Marian Decker, Ass't Solic. Gen.,
Lindsey Chervenak, Salt Lake City, for appellee

Nathalie S. Skibine, Salt Lake City, for appellant

CHIEF JUSTICE DURRANT authored the opinion of the Court, in which
JUSTICE PEARCE and JUSTICE PETERSEN joined.

JUSTICE HIMONAS authored a dissenting opinion, in which
ASSOCIATE CHIEF JUSTICE LEE joined.

CHIEF JUSTICE DURRANT, opinion of the Court:

**Introduction**

¶1 Leterrance Tewayne Johnson was at a Murray, Utah hotel
when he was approached by the hotel manager, Jason Sandoval.
When Mr. Sandoval asked Mr. Johnson to leave, a heated exchange
ensued. The State subsequently accused Mr. Johnson of attempting
to steal Mr. Sandoval's cell phone and, while fleeing after the failed
attempt, aiming a gun at and threatening to kill Mr. Sandoval if he

called the police. Mr. Sandoval called the police anyway, and the recording of that call was played for the jury at trial.

¶2 The jury convicted Mr. Johnson of aggravated robbery. He appeals his conviction, arguing the 911 call was inadmissible hearsay and that its admission at trial was prejudicial error. He also asks us to reexamine our practice of placing the burden on a criminal appellant to show that a preserved error was prejudicial. Instead, he suggests the State, as the party benefitting from the error, should be required to show the error was not prejudicial. Because we hold that the district court properly admitted the 911 call under the present sense impression exception to the rule against hearsay, we save the prejudice debate for a future case.

¶3 Mr. Johnson also appeals the district court's denial of his directed verdict motion. He argues, as he did at the district court, that the evidence was insufficient for the jury to find he used a gun to threaten Mr. Sandoval "in the course of committing robbery," as the aggravated robbery statute requires. We hold that the evidence was sufficient and affirm the district court's ruling.

**Background**

¶4 Mr. Johnson drove with his girlfriend into the parking lot of a hotel in Murray, Utah, because, according to Mr. Johnson, the engine of the car they were driving had begun to overheat.[1] After waiting for the engine to cool, Mr. Johnson and his girlfriend began to drive away before realizing it was still hot. Mr. Johnson stopped the car again and purportedly went to get water to pour into the radiator. His girlfriend stayed in the car, which was parked in an area of the property that was under renovation and closed to vehicles.

¶5 At the same time, the hotel manager, Mr. Sandoval, and his assistant were inspecting the premises. They noticed Mr. Johnson in one of the rooms under renovation and saw his girlfriend in the car parked nearby. Mr. Sandoval spoke to the girlfriend and, when Mr. Johnson came back, told them they needed to leave. According to Mr. Sandoval's assistant, there recently had been a number of drug deals and drug users on the property, and she suspected Mr. Johnson was involved in such activity. When Mr. Sandoval asked

---

[1] To the extent the facts are disputed, we review them "in a light most favorable to the jury's verdict" and recite them accordingly. *State v. Brown*, 948 P.2d 337, 339 (Utah 1997) (citation omitted).

him why he was there, Mr. Johnson claimed he was a guest of the hotel, but he was unable to produce a room key. He also claimed that his room was in one of the buildings under renovation, where no guests were currently staying. Upon further questioning, Mr. Johnson became agitated, asking Mr. Sandoval, "Who the f*** do you think you are?" and saying, "I belong here. I have friends here."

¶6 As the confrontation escalated, Mr. Sandoval's assistant began calling 911, which further angered Mr. Johnson. Mr. Sandoval testified that Mr. Johnson ran toward his girlfriend—who was still in the car—saying, "Give me my piece. Give me my piece." At that point, Mr. Sandoval snapped a picture of Mr. Johnson with his cell phone camera. Mr. Sandoval testified that, in response, Mr. Johnson ran toward him, exclaiming, "Give me your f***ing phone. . . . Who the f*** do you think you are taking pictures of me?" He then testified that Mr. Johnson grabbed his wrist and shirt, pulling Mr. Sandoval toward him and attempting to take the cell phone. But Mr. Sandoval managed to place the phone in his back pocket, where the assistant grabbed it. She then headed toward a hotel office, dialing 911 again.[2]

¶7 Mr. Sandoval testified that Mr. Johnson then climbed halfway into the passenger's side of the car, asking his girlfriend once again to give him his "f***ing piece." The assistant testified that when she was on her way to the office and about thirty feet from Mr. Johnson's car, she also heard Mr. Johnson ask his girlfriend to give him "something" and claimed to see him reach toward the passenger window as his girlfriend was reaching down. Mr. Johnson then got in the car, and his girlfriend climbed behind the wheel. According to Mr. Sandoval, as the pair drove away Mr. Johnson pointed a gun at Mr. Sandoval and said, "If you call the cops, we'll come back and kill you."

¶8 Mr. Sandoval was the only witness at trial to testify specifically that Mr. Johnson held a gun and that he pointed it at him as he drove away. The assistant, who started heading toward the hotel office ahead of Mr. Sandoval, testified that she did not see a gun. Mr. Johnson and his girlfriend testified that he never had a gun.

---

[2] According to the State's recitation of the facts, the assistant did not connect with a dispatcher during these first two 911 calls. But the record is not clear as to what happened during these calls.

¶9 After Mr. Johnson and his girlfriend drove away, Mr. Sandoval followed his assistant to the hotel office, where they called 911 again—this time connecting with a dispatcher. The call was placed just a "couple minutes" after Mr. Johnson had allegedly threatened to return and kill them. The State introduced a recording of the call, which was played for the jury three times—during Mr. Sandoval's direct examination, during closing argument, and during jury deliberations. In the recording, Mr. Sandoval delivers his account of what occurred: "I came out of the [inaudible], questioned some individuals in a room . . . . Once I took a picture, he got all aggravated and said if cops come I'm gonna come kill you. I took a picture of his car, license plate, and the individual." This statement did not make clear to the dispatcher what had transpired, so she asked again what happened. Mr. Sandoval responded that Mr. Johnson was selling drugs on the property.[3] Then, when asked when everything happened, he responded that it "happened just now."

¶10 Mr. Sandoval did not speak of the gun until two minutes into the call when the dispatcher asked, "Were weapons involved or mentioned?" Mr. Sandoval replied, "Yes, he was just trying to pull out a gun on me. . . . Then he tried to take my phone away. He like confronted me." The dispatcher then asked what type of gun Mr. Johnson had, to which Mr. Sandoval replied, "It was a handgun, like a 9 mm." Mr. Johnson was arrested about one week later and charged with aggravated robbery, based on the allegation that he attempted to take Mr. Sandoval's phone and threatened him with a gun as he fled the scene.

¶11 Mr. Johnson's alleged possession and threatened use of the gun was the only aggravating factor in his robbery conviction.[4]

---

[3] The State offered to play a version of the call in which Mr. Sandoval's claim that Mr. Johnson was selling drugs was redacted. But counsel for Mr. Johnson felt the call, if admitted, should be played in its entirety.

[4] *See* UTAH CODE § 76-6-302(1)(a) ("A person commits aggravated robbery if in the course of committing robbery, he . . . uses or threatens to use a dangerous weapon . . . .").

¶12 Mr. Johnson objected to the admission of the 911 call at trial, arguing it was hearsay under the Utah Rules of Evidence.[5] But the district court held that the call fell within the "present sense impression" exception to the rule against hearsay, relying upon statements Mr. Sandoval made during the call suggesting the events had occurred just before the call was placed.[6]

¶13 Mr. Johnson later moved for a directed verdict on the ground that he did not use a gun "in the course of committing" the offense, so his actions did not satisfy the elements of aggravated robbery under Utah Code section 76-6-302. The district court denied the motion.

¶14 The district court instructed the jury on both aggravated robbery and, alternatively, simple robbery.[7] It also included instructions on the lesser-included offense of threat of violence.[8] While deliberating, the jury requested, and was granted, the opportunity to re-hear the 911 call. But when the jury asked for a

---

[5] *See* UTAH R. EVID. 801(c) ("'Hearsay' means a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement."); UTAH R. EVID. 802 ("Hearsay is not admissible except as provided by law or by these rules.").

[6] A present sense impression is a "statement describing or explaining an event or condition, made while or immediately after the declarant perceived it." UTAH R. EVID. 803(1).

[7] Although Mr. Johnson never took possession of Mr. Sandoval's cell phone, he could be tried for "robbery" because that term is defined under the statute to include an attempted taking. *See* UTAH CODE § 76-6-301(1)(a).

[8] "A person commits a threat of violence if: (a) the person threatens to commit any offense involving bodily injury, death, or substantial property damage, and acts with intent to place a person in fear of imminent serious bodily injury, substantial bodily injury, or death; or (b) the person makes a threat, accompanied by a show of immediate force or violence, to do bodily injury to another." UTAH CODE § 76-5-107(1).

transcript of Mr. Sandoval's testimony, the court instructed them instead to rely on their own recollections of the evidence.[9]

¶15 The jury convicted Mr. Johnson of aggravated robbery, and the district court sentenced him to a prison term of five years to life. Mr. Johnson timely appealed.

¶16 On appeal, Mr. Johnson argues that admitting the 911 call under the present sense impression exception was prejudicial error. He also urges us to reexamine our caselaw placing the burden on a criminal appellant to show prejudice from a preserved error. Finally, he appeals the district court's denial of his directed verdict motion, asking us to review the sufficiency of the evidence that he was "in the course of committing a robbery" at the time he was alleged to have pointed the gun at Mr. Sandoval.[10]

**Standards of Review**

¶17 We apply three standards of review to a district court's admission of evidence. First, we review the "threshold statement of the legal principle governing admission or exclusion" for correctness.[11] Second, we review "findings of facts pertinent to a determination" for clear error.[12] Finally, we review the ultimate ruling on admissibility for abuse of discretion.[13]

---

[9] We do not suggest the district court acted wrongly here. Unlike oral testimony, "all evidence received as an exhibit is allowed back to jury deliberations, subject to the broad discretion of the district court." *See Wyatt v. State*, 2021 UT 32, ¶ 15, 493 P.3d 621. We mention the jury's request for both the 911 call and the testimony transcript only because Mr. Johnson argues that the fact the jury wanted both indicates "uncertainty in a case where the State's evidence was not overwhelming."

[10] *See* UTAH CODE § 76-6-302(1), (3) (requiring the aggravating factors for robbery to occur "in the course of committing robbery," which means either "during" the robbery "or in the immediate flight" thereafter).

[11] *Arnold v. Grigsby*, 2018 UT 14, ¶ 9, 417 P.3d 606 (citation omitted).

[12] *Id.* (citation omitted).

[13] *Id.* (citation omitted).

¶18 We review a district court's grant or denial of a motion for directed verdict for correctness.[14] But a defendant has a "substantial burden on appeal" to show that the district court erred in denying a motion for directed verdict.[15] The defendant "must show that, when viewed in the light most favorable to the State, *no evidence existed* from which a reasonable jury could find beyond a reasonable doubt that the defendant committed the crime."[16]

## Analysis

¶19 Mr. Johnson argues the district court erred in admitting the 911 call placed by Mr. Sandoval and his assistant immediately after the events at the hotel transpired because it was inadmissible hearsay. He also argues we should reexamine our caselaw placing the burden on criminal defendants to show prejudice from preserved errors. In other words, he argues that if admitting the call was error, we should presume he was prejudiced as a result—and therefore reverse his conviction—unless the State proves otherwise. Mr. Johnson also argues we should reverse his conviction because there was insufficient evidence that he threatened to use a gun "in the course of committing" the crime, elevating an otherwise simple robbery to aggravated robbery.

¶20 Because we hold that the district court did not err in admitting the 911 call, we do not reach the question of prejudice. We also affirm the district court's sufficiency of the evidence ruling.

### I. The District Court Properly Admitted the 911 Call under the Present Sense Impression Exception to the Rule Against Hearsay

¶21 Mr. Johnson argues the 911 call should not have been played for the jury because it was inadmissible hearsay under the Utah Rules of Evidence. The State counters that the district court correctly determined the 911 call was admissible under the "present sense impression" exception to the rule against hearsay. Rule 802 provides that hearsay is not admissible as evidence unless an exception is provided by law or by other provisions of the rules. Hearsay is defined as "a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in

---

[14] *State v. Stricklan*, 2020 UT 65, ¶ 30, 477 P.3d 1251.

[15] *Id.* (citation omitted).

[16] *Id.* (citation omitted) (internal quotation marks omitted).

evidence to prove the truth of the matter asserted in the statement."[17] The first exception provided by the rules to the prohibition on hearsay is the "present sense impression" exception.[18] This is the first case in which we directly address the scope of that exception.

¶22 In accordance with our "usual methods of statutory interpretation," we "interpret a court rule in accordance with its plain meaning[,] with our objective being to give effect to the intent of the body that promulgated it."[19] Here, the present sense impression exception, rule 803(1), is identical to the corresponding federal rule.[20] And where "our rules of evidence are identical to the federal rules, we generally seek to achieve uniformity" between them.[21] This means we look "to the interpretations of the federal rules by the federal courts to aid in interpreting the Utah rules."[22]

¶23 There is no dispute that the 911 call meets the definition of "hearsay" under rule 801(c). That is, the statements in the call were made by the declarant, Mr. Sandoval, outside the trial and were offered by the State to prove the truth of the matter asserted in those statements—Mr. Sandoval's account of the robbery. The question presented to us is whether the district court nevertheless properly admitted the call as a present sense impression, an exception to the hearsay rule defined as a "statement describing or explaining an event or condition, made while *or immediately after* the declarant perceived it."[23]

¶24 Mr. Johnson and the dissent argue the 911 call falls outside the present sense impression exception because it was not made with

---

[17] UTAH R. EVID. 801(c).

[18] *See* UTAH R. EVID. 803(1).

[19] *In re Discipline of Dahlquist*, 2019 UT 15, ¶ 21, 443 P.3d 1205 (citation omitted) (internal quotation marks omitted).

[20] *See* FED. R. EVID. 803(1). *See also* UTAH R. EVID. 803 advisory committee note to 2011 amendment ("This rule is the federal rule, verbatim.").

[21] *Robinson v. Taylor*, 2015 UT 69, ¶ 12 n.2, 356 P.3d 1230 (citation omitted) (internal quotation marks omitted).

[22] *Id.* (citation omitted).

[23] UTAH R. EVID. 803(1) (emphasis added).

sufficient immediacy once Mr. Sandoval perceived the events and because some of his statements were not spontaneous. Below, we discuss the proper standard for analyzing this question and hold that the district court properly admitted the call. In so doing, we recognize this case presents a close call, and the dissent ably articulates a reasonable position on the application of the rule to the facts. But because we must apply a deferential standard of review, the question before us is not whether the district court's decision to admit the evidence was the best one, but whether it was so wrong that it went "beyond the limits of reasonability."[24] Because this is a close case, we cannot so describe the district court's decision. Accordingly, we affirm.

*A. Rule 803(1) Itself Provides the Proper Standard for Determining Whether a Statement Falls within the Scope of the Exception*

¶25 Rule 803(1) provides that a statement qualifies as a present sense impression if it describes or explains an event or condition and is made "while or immediately after the declarant perceived it."[25] In *State v. Smith*, we said a statement must be "strictly contemporaneous" with an event to qualify as a present sense impression.[26] But in *Smith*, the hearsay exception at issue was the "excited utterance" exception, not the present sense impression exception.[27] We mentioned the latter exception simply to contrast it with the former's lack of an immediacy requirement.[28] Mr. Johnson suggests *Smith*'s "strictly contemporaneous" language is just another way of saying "while or immediately after"—the standard found in the rule. But *Smith* may also overstate the textual standard. The

---

[24] *State v. Tulley*, 2018 UT 35, ¶ 26, 428 P.3d 1005 ("A district court abuses its discretion only when its decision to admit or exclude evidence is beyond the limits of reasonability." (citation omitted) (internal quotation marks omitted)).

[25] UTAH R. EVID. 803(1).

[26] 909 P.2d 236, 240 (Utah 1995).

[27] *See id.*; UTAH R. EVID. 803(2) (defining an "excited utterance" as a "statement relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused").

[28] *Smith*, 909 P.2d at 240 ("The [excited utterance] need not be strictly contemporaneous with the startling event . . ., as is the case with the 'present sense impression' exception . . . .").

advisory committee notes to the federal rule explain that "in many, if not most, instances precise contemporaneity is not possible, and hence a slight lapse is allowable."[29] To the extent, then, that "strict" contemporaneity is synonymous with "precise" contemporaneity, it might require too much. We therefore find the language in *Smith* unhelpful, and, to avoid muddling the standard, we simply analyze whether the relevant statements in this case were made "immediately after" the declarant perceived the event.

¶26 Courts have not prescribed a precise time limit within which a statement must be made in order to qualify as a present sense impression.[30] Instead, courts look to the rationale behind the exception and the facts of each particular case.[31] The rationale underlying the present sense impression exception "is that substantial contemporaneity of event and statement negate the likelihood of deliberate or conscious misrepresentation."[32] In other words, if statements are made with sufficient contemporaneity, there is minimal "opportunity for reflection or interpretation that could undermine the reliability of the statements."[33] So when courts analyze whether statements were made "immediately after" an event, they must look to the particular facts of the case to determine whether the amount of time lapsed provided the declarant with an "opportunity for reflection" significant enough to undermine the statements' reliability. Again, courts should keep in mind "that in many, if not most, instances precise contemporaneity is not possible, and hence a slight lapse is allowable."[34]

---

[29] FED. R. EVID. 803 advisory committee note to paragraphs (1) and (2).

[30] *United States v. Lovato*, 950 F.3d 1337, 1344 (10th Cir. 2020) (citation omitted), *cert. denied, Lovato v. United States*, 141 S. Ct. 2814 (2021) (mem).

[31] *Id.* (citation omitted).

[32] FED. R. EVID. 803 advisory committee note to paragraphs (1) and (2).

[33] *Lovato*, 950 F.3d at 1344–45.

[34] FED. R. EVID. 803 advisory committee note to paragraphs (1) and (2). This means courts need not determine there was *no time* for reflection in order to admit a statement as a present sense

(continued . . .)

¶27 Several factors may govern this analysis. Among other considerations, courts might examine (1) the passage of time, (2) the existence or nonexistence of intervening events, and (3) the spontaneity of the statements.

¶28 Mr. Johnson and the dissent argue the district court applied an incorrect standard when determining the admissibility of the 911 call because it found that the statements in the call were "substantially contemporaneous" with the underlying event.[35] Mr. Johnson argues the court was required to find the statements were *strictly* contemporaneous with the event in order to admit them. And the dissent argues that "substantially contemporaneous" "is clearly the incorrect standard" and cites the district court's failure to "grapple" with the factors we have identified.[36]

¶29 Again, for reasons we have discussed, the "strictly contemporaneous" language from *Smith* is unhelpful. Courts need not apply a standard expressed in terms outside the language of rule 803(1) itself.[37] But here, the district court did apply the correct standard, expressly finding—consistent with the terms of the rule—that the statements were "made as the declarant perceived them or immediately thereafter." Its corresponding finding that the statements were "substantially contemporaneous with the events" does nothing to undermine that conclusion. And although we now provide courts with several factors to analyze when applying the

---

impression. Otherwise, the exception would virtually never apply. Instead, courts must consider all relevant circumstances to determine the extent to which the opportunity for reflection undermined the statement's reliability in the particular case.

[35] *See infra* ¶¶ 101–03. We note that the "substantially contemporaneous" language the district court employed comports with that found in the advisory committee notes to the federal rule: "substantial contemporaneity of event and statement negate the likelihood of deliberate or conscious misrepresentation." FED. R. EVID. 803 advisory committee note to paragraphs (1) and (2); *see also supra* ¶ 26.

[36] *See infra* ¶ 103.

[37] *See supra* ¶ 25.

rule, we cannot reverse the district court for failing to "grapple" with them here, where it applied the correct standard.[38]

### B. *Admitting the 911 Call Was within the District Court's Discretion*

¶30 Having clarified the proper standard for admitting hearsay statements as present sense impressions, we hold that the district court did not abuse its discretion by admitting the 911 call. In reaching this conclusion, we apply the three factors we identified above: (1) the passage of time, (2) the existence or nonexistence of intervening events, and (3) the spontaneity of the statements.[39] Because the passage of time between the event and the statements was brief, there were no intervening events, and the call and statements were spontaneous, we hold that each of these factors supports the district court's decision to admit the call.

1. The passage of time between the events and the statements in the 911 call was brief enough for the statements to qualify as present sense impressions

¶31 The passage of time is the first and most important factor in determining whether a declarant made a statement "immediately after" perceiving an event. The district court found that several of Mr. Sandoval's statements in the call supported the conclusion that they were made immediately after the events transpired. For example, Mr. Sandoval told the dispatcher that everything happened "just now," provided a license plate number, and stated that he and his assistant were still in danger. Having examined the record ourselves, we conclude that the district court's finding did not constitute an abuse of discretion.

¶32 The assistant placed the 911 call just a "couple minutes" after Mr. Johnson and his girlfriend drove away from the hotel and quickly handed the phone to Mr. Sandoval once she had provided the dispatcher with their location. The conversation about the gun took place about two minutes into the call. This approximately four-

---

[38] *See State v. Thornton*, 2017 UT 9, ¶ 52, 391 P.3d 1016 (recognizing that the rules of evidence "prescribe only standards for admission or exclusion of evidence and do not generally speak to the form of analysis to be performed on the record in support of a decision on admissibility").

[39] *See supra* ¶ 27.

minute passage of time—which includes the thirty-second pause in the conversation identified by the dissent[40]—is well within the bounds of the present sense impression exception as interpreted by numerous federal courts of appeals.[41] Indeed, we have been unable to find a single federal court of appeals that has held that a lapse of four or even five minutes is too long, and the dissent itself acknowledges that not "every statement made four minutes after the declarant's initial perception will automatically be excluded" from the exception.[42]

¶33 We recognize that a few other courts have interpreted the exception more narrowly. For example, one court has stated that the language of the rule was "not intended to suggest that declarations can qualify as present sense impressions even when they are made after the event being described has concluded."[43] Instead, the phrase "immediately thereafter" recognizes only that "it is virtually impossible to describe a rapidly unfolding series of events without some delay between the occurrence and the observer's utterance."[44]

---

[40] *See infra* ¶¶ 70, 72, 84, 88–89, 99, 104.

[41] *See, e.g., Lovato*, 950 F.3d at 1344–45 (upholding admission of 911 call as a present sense impression where caller provided details of event "three or four minutes after observing the event"); *United States v. Davis*, 577 F.3d 660, 668 (upholding admission of 911 call placed either just a few seconds or up to five minutes after event); *United States v. Hawkins*, 59 F.3d 723, 730 (8th Cir. 1995) (upholding admission of call placed approximately seven minutes after underlying events) *vacated on other grounds, Hawkins v. United States*, 516 U.S. 1168 (1996); *United States v. Blakey*, 607 F.2d 779, 785–86 (7th Cir. 1979) (holding that a time interval "between several minutes and 23 minutes" was "not so great as to render Rule 803(1) inapplicable"), *overruled on other grounds, United States v. Harty*, 930 F.2d 1257, 1263 (7th Cir. 1991).

[42] *Infra* ¶ 90.

[43] *People v. Vasquez*, 670 N.E.2d 1328, 1334 (N.Y. 1996).

[44] *Id.* The dissent also cites MCCORMICK ON EVIDENCE, which suggests that the "immediately after" language recognizes only that "some allowance must be made for the time needed for translating observations into speech." *Infra* ¶ 86 (citing 2 KENNETH S. BROUN, ET

(continued . . .)

¶34 But notwithstanding the fact that a few state courts have more strictly interpreted the phrase "immediately after," we are persuaded that the majority view is the better one. The stricter interpretation, as we explain below, is more limiting than the text of the rule itself indicates. It also limits the discretion we typically give district courts in admitting or excluding evidence where facts and circumstances vary widely from case to case.

¶35 The actual text of rule 803(1) does not mandate so strict a construction as that imposed by these courts. We would have to ignore common usage of the phrase "immediately *after*" to interpret the rule as categorically prohibiting a statement whenever just a few minutes lapse between the observation and the statement. For example, the sentence, "Dinner was served immediately after the ceremony,"[45] would not be rendered inaccurate if it took four minutes for the wait staff to start serving food. And a basketball player's postgame interview may accurately be said to have begun "immediately after the game"[46] even if it did not start until four minutes after the game clock hit zero.[47]

---

AL., MCCORMICK ON EVIDENCE § 271 (8th ed. 2020)) [hereinafter MCCORMICK ON EVIDENCE].

[45] *See Immediately*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/immediately (last visited Feb. 18, 2022).

[46] *See* Andy Nesbitt, *Shaquille O'Neal awkwardly interviews Donovan Mitchell, who responds to criticism: 'Aight'*, AZCENTRAL (Jan. 22, 2021), https://www.azcentral.com/story/sports/nba/2021/01/22/donov an-mitchell-shaquille-oneal-interview-tnt/115346374/ (so using the term "immediately after"); Erik Bacharach, *Blake Griffin's Postgame Interview Was Equal Parts Hilarious & Near Disaster*, HEAVY (Mar. 27, 2021), https://heavy.com/sports/brooklyn-nets/blake-griffin-detroit-pistons-interview-camera/ (same); Steven Loung, *After years of playoff heartbreak, Paul on verge of first Finals with Suns*, SPORTSNET (Jun. 27, 2021), https://www.sportsnet.ca/nba/article/years-playoff-heartbreak-paul-verge-first-finals-suns/ (same).

[47] Other examples abound. It is perfectly consistent with common English usage to say, "I take a 'shower immediately after exercise,'" even if it takes four minutes after the workout ends to get to the bathroom, undress, and get in the shower. *See* Ashley Mateo, *Experts*

(continued . . .)

¶36 Additionally, interpreting the term "immediately after" as strictly as some suggest would render that portion of the rule essentially inoperative.[48] Everyone recognizes that it takes the briefest of moments to "translat[e] observation into speech."[49] So if the term "immediately after" were omitted from the rule, we doubt that any court would bar a statement made after only a split second on the basis that it was not made "while"[50] the declarant perceived

_____

*Explain the Benefits of Taking Cold Showers*, RUNNER'S WORLD (May 28, 2020), https://www.runnersworld.com/health-injuries/a27357719/benefits-of-cold-showers/ (so using the term "immediately after"). One could also say that the headliner at a concert performed "immediately after" the opening act, even if it took four minutes for the headliner to take the stage after the opening act ended. Or that the justices discussed a case "immediately after" oral argument, even if it took four minutes for them to get to the conference room and begin the discussion.

The dissent finds these examples "unhelpful" because, in the dissent's view, they "ignore[] the context of the rule" and "contraven[e]" the definition of the term "immediately." *Infra* ¶ 92. We, on the other hand, find the examples quite useful given the "plain language approach" we must take in our interpretation. *Infra* ¶ 92 (citing *Olson v. Eagle Mountain City*, 2011 UT 10, ¶ 9, 248 P.3d 465). In fact, limiting our analysis to the word "immediately" is what would actually require us to ignore relevant context—the phrase in which the term appears. We must interpret the phrase "immediately *after*," the latter term mandating we analyze not only the timing but the "*sequence* of events." *See infra* ¶ 93. We more fully consider the sequence of events under our second factor, but that factor is closely related to the passage of time.

[48] *Snow, Christensen & Martineau v. Lindberg*, 2013 UT 15, ¶ 30, 299 P.3d 1058 ("[W]e . . . avoid interpretations that will render portions of a [rule] superfluous or inoperative." (alterations in original) (citation omitted)).

[49] MCCORMICK ON EVIDENCE § 271.

[50] UTAH R. EVID. 803(1).

the event.[51] An overly rigid reading of "immediately after" therefore renders the term unnecessary.[52]

¶37 Finally, both the dissent and Mr. Johnson point out that the 911 call at issue was the third such call placed by Mr. Sandoval's assistant, apparently to highlight its supposed lack of contemporaneity.[53] The record does not say exactly what occurred during the first two phone calls. All we know is that the assistant was apparently unable to tell a dispatcher what was occurring precisely as it was occurring—hence the need for the third call. This may have been because, as the State suggests, the assistant failed to connect with a dispatcher. Or it could be because the exigencies of the unfolding incident prevented her from completing the calls. Either way, we think these may fairly be considered circumstances—contemplated by the federal rule's advisory committee note—that would make "precise contemporaneity" impossible and "a slight lapse" to make the third call "allowable."[54]

¶38 For these reasons, we cannot say that a district court abuses its discretion if it finds that a lapse of just a few minutes between

---

[51] *See* Douglas D. McFarland, *Present Sense Impressions Cannot Live in the Past*, 28 FLA. ST. U. L. REV. 907, 931 (2001) (arguing that, were the term "immediately thereafter" eliminated from the federal rule, "a court would admit the statement 'Look, the car just ran the red light' . . . with as much alacrity as the statement 'Look, the car is running the red light'").

[52] *See id.* (suggesting that the term "immediately thereafter" "was never needed"). We also note that despite the claim that the drafters' intent was to allow only enough time to translate observation to speech, *see id.*; MCCORMICK ON EVIDENCE § 271; *Vasquez*, 670 N.E.2d at 1334, not even the advisory committee note to the federal rules attempts to so limit "immediately after." It says only that because "precise contemporaneity is not possible" in many instances, "a slight lapse is allowable." It offers no definition of "slight lapse," let alone one limiting it to a "fraction of a second." *See* FED. R. EVID. 803 advisory committee note to paragraphs (1) and (2). This is a glaring omission if such a strict interpretation was in fact intended.

[53] *See infra* ¶¶ 72, 88.

[54] FED. R. EVID. 803 advisory committee note to paragraphs (1) and (2).

event and statement falls within the present sense impression exception. We do note that the more time that passes, the less likely the exception will apply. There are likely few—if any—instances where a lapse of more than a few minutes falls within the scope of the exception.

¶39 But even if we were to view a lapse of just a few minutes between event and statement as categorically falling outside the scope of the present sense impression exception, the 911 call in this case could reasonably have been admitted under the view that the underlying event was still ongoing. As the dissent points out, "Sandoval and his assistant retreated to their office and locked the door" before providing the statements at issue.[55] If anything, this suggests that Mr. Sandoval and his assistant thought they may still be in danger. Indeed, Mr. Sandoval volunteered, in his initial description of the incident to the dispatcher, that Mr. Johnson said, "[I]f the cops come I'm gonna come kill you." Later in the call, Mr. Sandoval said he and his assistant were still in danger, adding, "I don't know if [Mr. Johnson]'s gonna come back and driveby shoot us." So the facts the dissent uses to suggest that the underlying event had concluded suggest that just the opposite was true from Mr. Sandoval's perspective.

¶40 For all the foregoing reasons, we find that the first factor—the time elapsed between event and statement—supports the district court's determination that the call was admissible. In the circumstances of this case, the lapse of just a few minutes falls within the language of rule 803(1) and within the federal courts' interpretations of the identical federal rule. Alternatively, the event giving rise to the call can fairly be considered to have been ongoing when the call took place. Applying this factor, we simply cannot say that, in this case, admitting the evidence was "beyond the limits of reasonability."[56]

---

[55] *Infra* ¶ 72. *See also infra* ¶ 88.

[56] *See Tulley*, 2018 UT 35, ¶ 26 ("A district court abuses its discretion only when its decision to admit or exclude evidence is beyond the limits of reasonability." (citation omitted) (internal quotation marks omitted)).

2. There were no intervening events that would suggest the 911 call did not come immediately after the event Mr. Sandoval described

¶41 Another important factor in determining the admissibility of a statement as a present sense impression is whether there were intervening events between the event and the statement. When the word "immediately" is followed by a preposition such as "after," as it is in rule 803(1), it means "with no person or thing in between."[57] The record in this case supports the undisputed conclusion that, after Mr. Johnson drove away, Mr. Sandoval followed his assistant "in a direct course" to the hotel office, where they immediately called 911.[58] There is no indication Mr. Sandoval discussed the incident with his assistant—or had time to do so—before describing it to the dispatcher. Under such circumstances, it is reasonable to conclude that there was little opportunity for reflection.

¶42 Mr. Johnson suggests the fact that Mr. Sandoval and his assistant placed the 911 call from the safety of a locked office undermines this conclusion. Certainly, their moving to a different location from where the threat occurred required an intervening walk and suggests some amount of time had lapsed. But in this case, it took no more than a "couple minutes," and they moved locations only to avoid any danger were Mr. Johnson to return. Once again, from their perspective, the event was still ongoing.[59] Besides, courts have not always required that statements admitted as present sense impressions be uttered from the precise location where the events

---

[57] *See Immediately,* THE BRITANNICA DICTIONARY, https://britannica.com/dictionary/immediately (last visited Feb. 21, 2022). *See also Immediately,* MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/immediately (last visited Feb. 21, 2022).

[58] Merriam-Webster also defines "immediately" as synonymous with "straightway," meaning, "in a direct course." *See Immediately,* MERRIAM-WEBSTER DICTIONARY; https://www.merriam-webster.com/dictionary/immediately (last visited Feb. 18, 2022); *Straightway,* MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/straightway (last visited Feb. 18, 2022).

[59] *See supra* ¶ 39.

they describe transpired.[60] So this factor also supports the district court's decision to admit the call.

### 3. The 911 call was spontaneous

¶43 Mr. Johnson argues the present sense impression exception requires not just contemporaneity but "spontaneity" as well. And he argues that because Mr. Sandoval made several statements in response to questions from the dispatcher, those statements cannot qualify as present sense impressions. These include Mr. Sandoval's statements relating to the gun, which he did not mention until the dispatcher asked whether weapons were involved.

¶44 We disagree that the rule requires the sort of spontaneity Mr. Johnson suggests it does. Nothing in the text of rule 803(1) requires that a statement be an entirely self-generated "blurt out[]" that lacks any sort of external prompting in order to fall within the exception.[61]

---

[60] *See, e.g.*, *Lovato*, 950 F.3d at 1346 (holding that "the caller's movement from the location of the shooting . . . does not eliminate sufficient contemporaneity" (citing *United States v. Dean*, 823 F.3d 422, 428 (8th Cir. 2016); *Hawkins*, 59 F.3d at 730)). *But see United States v. Manfre*, 368 F.3d 832, 840 (8th Cir. 2004) (holding a statement inadmissible as a present sense impression where, "[a]t the very least, there was an intervening walk or drive"). The facts in *Manfre* differ significantly from the facts in this case. In *Manfre*, it was unclear how much distance the declarant had traveled after the event and how much time had elapsed between the event and the statement. *Id.* at 839–40. But in this case, it is undisputed that no more than a couple of minutes passed between the event and the statements at issue, and the "intervening walk" spanned a short distance from the parking lot to the office.

[61] *See infra* ¶¶ 78, 100 n.108; *Spontaneous*, AM. HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE, https://www.ahdictionary.com/word/search.html?q=spontaneous (defining "spontaneous" as "[h]appening or arising without apparent external cause; self-generated" and "[a]rising from a natural inclination or impulse and not from forethought or prompting").

And we decline to "infer substantive terms into the text that are not already there."[62]

¶45 It is true that the present sense impression and the excited utterance "are both often loosely described, *sometimes misleadingly*, as 'spontaneous' statements."[63] But the "imprecise use of that adjective . . . should not be permitted to obscure the critical distinction between the two exceptions: the underlying reliability factor that justifies their admission."[64] Indeed, the advisory committee note to the federal rule clarifies that while spontaneity is the "key factor" to both exceptions, that spontaneity is "arrived at by somewhat different routes" in each instance.[65] Excited utterances are spontaneous in that a startling circumstance "temporarily stills the capacity of reflection."[66] Present sense impressions, on the other hand, are spontaneous in that the "substantial contemporaneity of event and statement" provides minimal opportunity for reflection.[67] In other words, the spontaneity that rule 803(1) requires — consistent with its text — is all about timing.

¶46 Although we decline to read into rule 803(1) a requirement that a hearsay statement be entirely self-generated in order to be admitted as a present sense impression, we acknowledge that such spontaneity may be a relevant factor in determining whether there was an opportunity for reflection long enough to undermine a statement's reliability. Applying this factor along with the others we have applied in this case does not lead us to conclude the district court abused its discretion in admitting the call.

¶47 On the one hand, the call itself was made spontaneously. Mr. Sandoval's assistant dialed 911 of her own accord, and there is no

---

[62] *Bryner v. Cardon Outreach, LLC*, 2018 UT 52, ¶ 21, 428 P.3d 1096 (citations omitted).

[63] *Vasquez*, 670 N.E.2d at 1334 (emphasis added) (citation omitted). *See also* MCCORMICK ON EVIDENCE § 271; 4 JONES ON EVIDENCE § 28:2 (7th ed. 2000); *infra* ¶ 96.

[64] *Vasquez*, 670 N.E.2d at 1334.

[65] FED. R. EVID. 803 advisory committee note to paragraphs (1) and (2).

[66] *Id.*

[67] *Id.*

suggestion the two first discussed the incident or what they would say to the police. On the other hand, some of Mr. Sandoval's statements in the call were responses to questions. For example, Mr. Sandoval did not mention Mr. Johnson had a gun until the dispatcher asked whether weapons were involved. We recognize that "answering questions rather than giving a spontaneous narration could increase the chances that the statements were made with calculated narration."[68] But a person "can still make statements without calculated narration even if made in responses to questions."[69] And the "mere fact that the caller made statements in response to questions . . . does not demonstrate that the statements were a product of strategic modification outside the bounds of Rule 803(1)," nor does it "materially diminish spontaneity under the circumstances."[70]

¶48 The effect a question has on the admissibility of a statement will depend on the facts of the case. In some circumstances, for example, a question may prompt an answer that goes beyond describing the underlying event or may call for the sort of reflection that makes the exception inapplicable. For example, Mr. Johnson cites *United States v. Green*, which held that a statement was not a present sense impression in part because it was made after the declarant had already been questioned "about the details of the transaction the statement purport[ed] to describe" and after the declarant "was expressly asked to reflect upon the events in question."[71]

¶49 Here, the questions and answers about the gun were directly related to the event Mr. Sandoval had just perceived. And unlike in *Green*, they were a part of the first conversation in which Mr. Sandoval offered his impressions of the event. Additionally, his statements were made just four minutes after he claimed to have seen the gun, while still in the heat of the moment, and he answered the questions immediately and without hesitation. Under such circumstances, we cannot say that the district court abused its discretion in concluding that Mr. Sandoval had minimal time for

---

[68] *United States v. Boyce*, 742 F.3d 792, 797–98 (7th Cir. 2014).

[69] *Id.* at 797.

[70] *Lovato*, 950 F.3d at 1345–46 (citing *Boyce*, 742 F.3d at 797).

[71] 556 F.3d 151, 157 (3d Cir. 2009).

reflection and fabrication. We would be more concerned had the thirty-second delay in the conversation, repeatedly highlighted by the dissent,[72] occurred between the dispatcher's questions and Mr. Sandoval's answers. But it didn't. Instead, Mr. Sandoval immediately answered questions that he was not necessarily expecting (and so had not reflected upon), and he offered more than a "a mere 'yes' or 'no'" in response.[73] The answers, in other words, were given in a "natural" way "without a lot of thought or planning."[74]

¶50 The dissent also argues that Mr. Sandoval's statements about the gun were not an "impression." And it defines "impression" as a "declarant's initial, unstudied reaction to the event or fact presented

---

[72] *See infra* ¶¶ 70, 72, 84, 88–89, 99, 104.

[73] *See Leading question*, BLACK'S LAW DICTIONARY (11th ed. 2019) (defining a "leading question"—which is how the dissent characterizes the first question about weapons, *infra* ¶ 100—as one "that suggests the answer" and especially one "that may be answered by a mere 'yes' or no'"). The question about whether weapons "were involved or mentioned" is not as leading as the dissent asserts. The question did not necessarily "suggest[] the answer." And there is certainly no indication the dispatcher desired an affirmative answer. *See id.* ("A leading question is one which puts the answer (*which the attorney desires*) into the mouth of the witness.") (emphasis added) (citing SAMUEL WEISS, HOW TO TRY A CASE 53–54 (1930)). And the second question, regarding the type of gun Mr. Sandoval allegedly saw, suggested no answer whatsoever. *Cf. Boyce*, 742 F.3d at 797. In *Boyce*, the court admitted a 911 call as an excited utterance but also analyzed it as a present sense impression. Similar to the 911 call in this case, the declarant "did not mention a *gun* until questioned by the dispatcher as to whether [the defendant] had any *weapons*." *Id.* (emphasis added). The court suggested that the possibility of calculated narration was lessened because the "operator did not ask whether [the defendant] had a gun; it was [the declarant] who first brought up the gun's presence." *Id.* The same is true in this case.

[74] *See Spontaneous*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/spontaneous (last visited Feb. 18, 2022).

to the declarant's senses."[75] We find no inconsistency with this definition and the statements admitted. Although the statements were responses to questions, those questions, for the reasons we have explained, probed Mr. Sandoval's "initial, unstudied reaction" to the underlying events.

¶51 In sum, we hold that the district court reasonably determined Mr. Sandoval's statements in the 911 call were made "immediately after" he perceived the underlying events. The statements were made within just a few minutes of the event's conclusion, there were no intervening events, and both the call and the statements made therein were spontaneous.

## II. The District Court Properly Denied Mr. Johnson's Motion for Directed Verdict

¶52 After the conclusion of the State's case in chief, Mr. Johnson moved for a directed verdict, asking the district court to find that the evidence was insufficient as a matter of law to support a conviction of aggravated robbery. The district court denied the motion. Mr. Johnson appeals that decision, arguing there was insufficient evidence he used or threatened to use a gun in the course of committing the robbery.

### A. Mr. Johnson Preserved His Sufficiency of the Evidence Challenge

¶53 The State argues Mr. Johnson's sufficiency of the evidence challenge is unpreserved. We disagree. The State specifically says that Mr. Johnson "raises new, more specific *arguments* for appeal." (Emphasis added.) "We generally will not consider an issue unless it has been preserved for appeal. An issue is preserved for appeal when it has been presented to the district court in such a way that the court has an opportunity to rule on [it]."[76] But "our case law draws a distinction between new 'issues' (like distinct claims or legal theories) and new 'arguments' in support of preserved issues (such as the citation of new legal authority)."[77] "*Issues* must be preserved,

---

[75] *Infra* ¶ 98.

[76] *Patterson v. Patterson*, 2011 UT 68, ¶ 12, 266 P.3d 828 (alteration in original) (citation omitted) (internal quotation marks omitted).

[77] *Hand v. State*, 2020 UT 8, ¶ 6, 459 P.3d 1014 (citation omitted).

not arguments for or against a particular ruling on an issue raised below."[78]

¶54 Arguing in favor of a directed verdict at trial, counsel for Mr. Johnson stated the following:

> I move . . . for the Court to dismiss the aggravated robbery. I think the testimony of Mr. Sandoval gets him to a robbery at least . . . . However, a gun was not used at that time, *nor was it used in the course of committing the offense.* The gun was . . . a gratuity afterwards, after it was all over . . . . And it could have been charged as another offense, *but was not part of the robbery, the force being used or in the immediate flight therefrom.*

(Emphasis added.)

¶55 Contrary to the State's assertion, counsel's objection did alert the trial court to the issue Mr. Johnson raises on appeal. The grounds for the motion were sufficiently clear and specific for the trial court to rule on the issue of whether the gun was used in a manner sufficient to qualify as an aggravator.[79] Counsel argued, assuming the presence of the gun, that the gun had nothing to do with the alleged robbery or the immediate flight therefrom. This is precisely the issue on appeal. Additionally, the State argued that its evidence satisfied the elements of aggravated robbery, noting the "immediate flight" element. The district court agreed, also referring to the "immediate flight" element.

---

[78] *Gressman v. State*, 2013 UT 63, ¶ 45, 323 P.3d 998 (citing UTAH R. APP. P. 24(a)(5)(A)). *See also State v. Garcia*, 2017 UT 53, ¶¶ 50–52, 424 P.3d 171 (holding that the defendant did not need to have argued the application of a particular canon of construction at the district court to use it in his argument on appeal where the issue of statutory interpretation was preserved); *Bagley v. Bagley*, 2016 UT 48, ¶ 26, 387 P.3d 1000 (addressing a petitioner's "absurd results" argument, not raised below, because it did "not raise a wholly new issue").

[79] *See State v. Low*, 2008 UT 58, ¶ 17, 192 P.3d 867 (requiring an objection to be "clear or specific" or "clear from the context" (citation omitted)).

¶56 The preservation doctrine's policies of "judicial economy and fairness" are not frustrated by considering the merits of this issue.[80] Mr. Johnson simply expands his arguments to more fully explain his understanding of the statutory term "immediate flight" and why his alleged use of a gun was not part of an immediate flight from the robbery.

### B. A Reasonable Jury Could Conclude that Mr. Johnson's Threat Occurred "in the Course of Committing Robbery"

¶57 Mr. Johnson argues that even accepting Mr. Sandoval's testimony about the gun, there was no evidence that Mr. Johnson's threat to use it occurred in the course of committing the robbery. Under the statute, a "person commits aggravated robbery if *in the course of committing* robbery, he . . . uses or threatens to use a dangerous weapon."[81] And the statute provides that an act is "in the course of committing a robbery" even if it occurs only "in the immediate flight after the attempt or commission of a robbery."[82] We hold that a reasonable jury could conclude the alleged threat occurred "in the immediate flight after," and therefore "in the course of committing," the robbery.[83]

¶58 Mr. Johnson first takes issue with the State's evidence that he asked his girlfriend for his "piece" before Mr. Sandoval even took his photo, the act that served as the catalyst for the robbery. He says that "[m]entioning a gun before the robbery, and before even the conception of the robbery . . . was not 'in the course of committing a robbery.'" Mr. Johnson relies on *State v. Howland* to support his contention that his actions "prior to commission of the charged crime" were not done in the course of committing that crime.[84]

---

[80] *See Patterson*, 2011 UT 68, ¶ 15.

[81] UTAH CODE § 76-6-302(1) (emphasis added).

[82] *Id.* § 76-6-302(3).

[83] *See State v. Stricklan*, 2020 UT 65, ¶ 30, 477 P.3d 1251 (stating that we uphold a denial of a motion for directed verdict based on an insufficiency of the evidence claim if some evidence exists from which a reasonable jury could find that the elements of the crime have been proven beyond a reasonable doubt).

[84] 761 P.2d 579, 581 (Utah Ct. App. 1988).

¶59 We agree with Mr. Johnson's point that, even assuming he did commit robbery, asking for his gun before he conceived of the crime cannot be the basis for the aggravator. But evidence that Mr. Johnson asked for his gun earlier supports the jury's determination that there was a gun in the car that he threatened to use later. Moreover, this evidence was not necessary for the jury to determine Mr. Johnson threatened to use a gun in the course of the robbery.[85] Mr. Sandoval testified that Mr. Johnson asked for his "piece" again after Mr. Sandoval took his picture and that he pointed the gun and threatened to kill him as he and his girlfriend drove away. This testimony was itself sufficient evidence for a reasonable jury to conclude that Mr. Johnson had a gun and threatened to use it.

¶60 Next, Mr. Johnson contends he was not in "flight" when he left the hotel. But we conclude the jury reasonably could have found that he was.

¶61 Although "flight" is not defined in the statute, we have noted that its "use in the criminal law . . . is quite common."[86] And we, as well as the court of appeals, have referred to the definition of "flight" as provided in *Black's Law Dictionary* on multiple occasions.[87] It is "[t]he act or an instance of fleeing, esp. to evade arrest or prosecution."[88] Meanwhile, the definitions of "flee" include to "run away; to hasten off;" and "to try to evade a problem."[89] We also stated, in *State v. Finlayson*, that "flight includes (1) a leaving and (2) a subsequent hiding out, evasion, or concealment."[90] Under these definitions, we have no doubt the jury reasonably could find that Mr. Johnson was in "flight" when he allegedly threatened Mr. Sandoval and his assistant with a gun.

---

[85] As Mr. Johnson himself points out, there "is no indication that the jury, the State, or the court" relied on this evidence.

[86] *State v. Finlayson*, 2000 UT 10, ¶ 34, 994 P.2d 1243, *overruled on other grounds by State v. Wilder*, 2018 UT 17, 420 P.3d 1064.

[87] *See, e.g., id.* ¶ 35; *State v. Escobar-Florez*, 2019 UT App 135, ¶ 54, 450 P.3d 98; *State v. LoPrinzi*, 2014 UT App 256, ¶ 25, 338 P.3d 253.

[88] *Flight*, BLACK'S LAW DICTIONARY (11th ed. 2019).

[89] *Flee*, BLACK'S LAW DICTIONARY (11th ed. 2019).

[90] 2000 UT 10, ¶ 35.

¶62 Mr. Sandoval testified that Mr. Johnson drove away "slowly." But this does not preclude a finding that Mr. Johnson was in flight. Under *Finlayson*, we required only "a leaving"; we did not say how quickly one must leave to be considered in flight.[91] And though one relevant definition of "flee" requires "run[ning]" or "hasten[ing]," the other does not.[92] It requires only an attempt "to evade a problem."[93] Here, there is no dispute Mr. Johnson was "leaving" when he allegedly threatened to use the gun. And though he may have been leaving slowly, there is little doubt he was doing so, at least in part, to "evade a problem." Mr. Sandoval testified that Mr. Johnson's threat was, "If you call the cops, we'll come back and kill you." This testimony supports the conclusion that Mr. Johnson thought Mr. Sandoval might call the police, tried to prevent him from doing so, and did not want to be there if he did. In other words, Mr. Johnson was attempting to "evade arrest or prosecution."[94]

¶63 Mr. Johnson also argues that because Mr. Sandoval had previously asked him to leave, and because he had no property that did not belong to him when he left, he was not fleeing. These arguments are unpersuasive. First, Mr. Johnson left not when Mr. Sandoval asked him to, but only after asserting his right to be there and engaging in the conduct underlying the robbery conviction. Next, the fact that Mr. Johnson had no stolen property with him when he left is irrelevant. Indeed, the statute expressly provides that an aggravating act "shall be considered to be 'in the course of committing a robbery'" even "if it occurs in the immediate flight after the *attempt* . . . of a robbery."[95] Of course, a defendant cannot flee with another's property if he merely attempted a robbery.

¶64 Finally, Mr. Johnson suggests he was not in flight because there was no evidence he attempted to hide or conceal himself. He correctly points out that *Finlayson* required both a leaving and "a

---

[91] *Id.; accord State v. Oseguera-Lopez*, 2020 UT App 115, ¶ 31, 473 P.3d 196 ("That [the defendant] quickly walked away rather than sprinted does not mean that he was not fleeing from his attempted theft.").

[92] *Flee*, BLACK'S LAW DICTIONARY (11th ed. 2019).

[93] *Id.*

[94] *See Flight*, BLACK'S LAW DICTIONARY (11th ed. 2019).

[95] UTAH CODE § 76-6-302(3) (emphasis added).

subsequent hiding out, evasion, or concealment."[96] As an initial matter, we question the appropriateness of the latter requirement. The aggravated robbery statute, like the aggravated kidnapping statute in *Finlayson,* is concerned only with a defendant's actions "in the *immediate* flight" after the crime.[97] In circumstances where the aggravator occurs in the "immediate flight" after a robbery, it is difficult to imagine the legislature intended the statute to apply only when the defendant subsequently goes into hiding. Accordingly, we disavow the quoted language from *Finlayson.*

¶65 Even assuming a "subsequent hiding out, evasion, or concealment" is required, however, the jury reasonably could have found it here. As the State points out, Mr. Johnson was able to "evade capture for nearly a week."

¶66 Mr. Johnson also points to other criminal statutes he says "better fit the allegation that Johnson made a threat after the attempted robbery was over." These are the threat of violence statute[98] and the witness tampering statute.[99] Again, we are unpersuaded. Certainly, a person's conduct can constitute multiple crimes. Mr. Johnson's argument, identifying two separate statutes that arguably cover his actions, admits as much. So as long as the jury reasonably could have found that Mr. Johnson's threat occurred while he was in flight after the robbery—which it did—it is

---

[96] *Finlayson,* 2000 UT 10, ¶ 35.

[97] *See* UTAH CODE § 76-6-302(3) (emphasis added); *id.* § 76-5-302(2).

[98] UTAH CODE § 76-5-107(1) ("A person commits a threat of violence if: (a) the person threatens to commit any offense involving bodily injury, death, or substantial property damage, and acts with intent to place a person in fear of imminent serious bodily injury, substantial bodily injury, or death; or (b) the person makes a threat, accompanied by a show of immediate force or violence, to do bodily injury to another.").

[99] UTAH CODE § 76-8-508(1) ("A person is guilty of the third degree felony of tampering with a witness if, . . . with the intent to prevent an official proceeding or investigation, he attempts to induce or otherwise cause another person to . . . withhold any testimony, information, document, or item.").

irrelevant that other statutes would also criminalize his threat had it occurred independent of the robbery.

¶67 In sum, the district court did not err in denying Mr. Johnson's directed verdict motion. There was sufficient evidence Mr. Johnson had a gun and that he threatened to use it "in the immediate flight after" the robbery.

## Conclusion

¶68 We hold that the district court properly admitted the 911 call under the present sense impression exception to the rule against hearsay evidence. The admission was consistent with the text of the rule and with decisions of federal courts applying an identical rule in similar circumstances. Finding no error, we decline at this time to reexamine our caselaw requiring criminal appellants to show prejudice from preserved errors. We also hold there was sufficient evidence to support Mr. Johnson's aggravated robbery conviction. Accordingly, we affirm.

———————————

JUSTICE HIMONAS, dissenting:

¶69 Pound on a square peg long enough and you can jam it into a round hole. But in the process, you're going to do serious damage to both the peg and the hole. That pretty much sums up how I view the majority opinion in this case—as trying awfully hard to fit the facts of the case into the text and theory of the present sense impression exception. Respectfully, they just don't fit.

¶70 My disagreement with the majority stems primarily from its application of the legal framework it lays out to Johnson's case. In my view, we simply cannot rationalize the admission of the entire 911 call with the text and theory of the exception. I agree with the majority that courts must determine whether the declarant of the statement had opportunity for reflection significant enough to undermine the statement's reliability. *See supra* ¶ 26. And I agree that the timing of the statement, the presence of intervening events, and the spontaneity of the statement are all important factors in the analysis. But I cannot agree with the majority's ultimate holding: that the 911 call was properly admitted as a present sense impression. It seems to me that the majority is trying awfully hard to fit the entire call into the exception—to pound a square peg into a round hole. But the most pertinent part of the call—the part referencing a gun— didn't occur until more than four minutes after Johnson drove away and only after an approximately thirty-second pause in the

conversation, when the dispatcher prompted Sandoval with a question specifically asking about weapons.

¶71 I cannot conclude that Sandoval didn't have adequate time for reflective thought before asserting that there was a gun. And, having been asked to examine the 911 call in its entirety, I would hold that it was an abuse of discretion to let in the entire call as a present sense impression. The statements about a gun—which were used by the State to enhance Johnson's charge and sentence—simply weren't present sense impressions. The majority's holding allows into evidence clearly reflective and prompted statements as "present sense impressions." I believe this to be in error and to be setting bad precedent. Accordingly, I dissent.

## ANALYSIS

¶72 Following the incident between Sandoval and Johnson, Sandoval and his assistant retreated to their office and locked the door. There, inside the office and no longer in the presence of Johnson, the assistant dialed 911 for a third time. The statements made during this call are at issue in this case. The first minute of the conversation is mostly the assistant speaking with the dispatcher, providing the address of the hotel. After that, Sandoval takes the phone and responds to the following prompts: (1) "Tell me exactly what happened?"; (2) "I'm not understanding what happened. So he was, he was trespassing, or?"; and (3) "When did this happen?" In response to these three questions, Sandoval explains the incident, but doesn't mention a gun or any weapon. What follows is a significant pause in the conversation between Sandoval and the dispatcher. There are thirty full seconds where Sandoval says nothing but "okay" and "thank you," accompanied by either stretches of silence or inaudible conversation between Sandoval and his assistant.

¶73 Following this pause in the conversation, the dispatcher asks Sandoval if any weapons were involved. Only then does Sandoval mention that Johnson was "trying to pull out a gun on" him. And, prompted further by the dispatcher asking what type of gun, Sandoval says, "ah, it was a handgun, like a 9mm."

¶74 Johnson was charged with aggravated robbery. The State sought to introduce the 911 call into evidence, and Johnson objected, arguing that the call was hearsay under the Utah Rules of Evidence. The district court allowed in the call as a present sense impression, and the call was played for the jury during witness questioning, during the State's closing argument, and again, by request, during

deliberations. Although the three other individuals present at the incident—Johnson, Johnson's girlfriend, and Sandoval's assistant—all testified that there wasn't a gun or that they didn't see a gun or hear one mentioned, the jury found Johnson guilty of aggravated robbery. The gun was the sole aggravating factor in his conviction.

¶75 Johnson appealed, arguing in part that the admission of the 911 call as a present sense impression was in error and that he was prejudiced by it. I agree.

## I. THE ADMISSIBILITY OF THE CALL AS A PRESENT SENSE IMPRESSION

¶76 It's important at the outset to define the issue before us. The question isn't whether the 911 call was admissible at trial or whether we believe it to be sufficiently reliable evidence. No, the right inquiry is, instead, whether the 911 call was admissible specifically under rule 803(1), the hearsay exception for present sense impressions and the evidentiary vehicle the State chose to employ.

¶77 "There is no dispute that the 911 call meets the definition of 'hearsay' under rule 801(c)." *Supra* ¶ 23. And hearsay is generally excluded from trial because secondhand accounts come with significant concerns of faulty memory, perception, clarity, and sincerity—in other words, we consider hearsay statements unreliable. *See, e.g.,* Edmund M. Morgan, *The Law of Evidence, 1941-1945*, 59 HARV. L. REV. 481, 541 (1946); DEBORAH JONES MERRITT & RIC SIMMONS, LEARNING EVIDENCE: FROM THE FEDERAL RULES TO THE COURTROOM 445 (4th ed. 2018). To address these concerns, the exclusion of hearsay indicates "a general policy of requiring that testimony be given by witnesses in open court, under oath, and subject to cross-examination." 2 KENNETH S. BROUN, ET AL., MCCORMICK ON EVIDENCE § 245 (8th ed. 2020) (hereinafter MCCORMICK ON EVIDENCE).

¶78 There are several exceptions to the hearsay rule. One is the present sense impression exception, which permits hearsay statements "describing or explaining an event or condition, made while or immediately after the declarant perceived it." UTAH R. EVID. 803(1). The underlying theory of reliability for present sense impressions is that "substantial contemporaneity of event and statement negat[]e the likelihood of deliberate or conscious misrepresentation." FED. R. EVID. 803 advisory committee note to paragraphs (1) and (2). Put differently, present sense impressions are thought to be reliable because they're statements made either while or immediately after a declarant witnesses or experiences something;

the idea is that they're spontaneous blurt outs, happening simultaneously with the event or condition, free of calculated misrepresentation or accidental inaccuracies.

¶79 As the majority opinion points out, Utah's rule is identical to the federal rule. *Supra* ¶ 22. "Since the advisory committee generally sought to achieve uniformity between Utah's rules and the federal rules, this Court looks to the interpretations of the federal rules by the federal courts to aid in interpreting the Utah rules." *State v. Banner*, 717 P.2d 1325, 1333–34 (Utah 1986) (citation omitted). "Likewise, the interpretation of a rule by state courts whose rule is similarly patterned after the original federal rule may also be helpful." *State v. Rothlisberger*, 2006 UT 49, ¶ 28, 147 P.3d 1176.

¶80 But, as the briefing in this case demonstrates, there isn't one uniform interpretation of this exception. Both federal and state courts interpreting this rule vary in how they construe this exception, even with identical language. *See supra* ¶¶ 32–33; *see also Hallums v. United States*, 841 A.2d 1270, 1278 (D.C. 2004) ("We recognize there are varying approaches to the admission of statements under the exception for present sense impressions."). There is no "*per se* rule indicating what time interval is too long" under the exception, *see United States v. Lovato*, 950 F.3d 1337, 1344 (10th Cir. 2020) (citation omitted), and courts inevitably differ in how long of a lapse they allow between the declarant's perception of the event or condition and the declarant's statement. Courts also differ in whether statements admitted under the exception must be supported with corroborating evidence. *See, e.g.*, *Hallums*, 841 A.2d at 1278 (detailing the different positions various courts take).

¶81 This leaves our court in an unusual situation. We've never before addressed the present sense impression exception head-on. And while federal and state court interpretations of the rule can be helpful as a guide, we're certainly not bound by other courts' analyses—indeed, how could we be, when the analyses differ from court to court? No, we ultimately must decide for ourselves the meaning of the exception and its proper application and standard in Utah law.

¶82 I believe the majority correctly identifies the proper legal standard under which to analyze the present sense impression. But I strongly disagree with the majority's application of that standard to the facts of this case. And ultimately, this disagreement leads me to the conclusion that admitting the 911 call was an abuse of discretion.

HIMONAS, J., dissenting

### A. The Appropriate Inquiry for Present Sense Impressions

¶83 I agree with more of the majority opinion than might be expected, considering my dissent. I agree that the text of the rule itself provides the proper standard for determining whether a statement falls within the scope of the exception, and that we should analyze the relevant statements based on the "immediately after" language, rather than the "substantially contemporaneous" language used by the district court. *See supra* ¶¶ 25–27. I also agree that there is no precise time limit within which a statement must be made to qualify and that courts generally look to the rationale behind the exception and the facts of each particular case. And so, I naturally agree with the majority that courts "must look to the particular facts of the case to determine whether the amount of time lapsed provided the declarant with an 'opportunity for reflection' significant enough to undermine the statements' reliability." *Supra* ¶ 26. Present sense impressions are meant to be *present* sense, to describe the impression "while or immediately after" it's formed. UTAH R. EVID. 803(1). Because of this, "the appropriate inquiry" has to be focused on time: specifically, "whether sufficient time elapsed to have permitted reflective thought." MCCORMICK ON EVIDENCE § 271.[100] Lastly, I also agree with the majority that in determining whether sufficient time elapsed to have permitted reflective thought, the timing of the statement, any intervening events, and the spontaneity of it are all relevant.

---

[100] This inquiry, focused on whether there was time for reflective thought, is also consistent with how many other jurisdictions analyze the present sense impression exception. The Sixth Circuit, for example, has said that the present sense impression exception is "grounded on the notion that a person is more likely to speak truthfully before he has time to reflect." *United States v. Ellis*, 626 F. App'x 148, 152 (6th Cir. 2015). The Ninth Circuit has held that "to qualify under [the present sense impression] exception, an out-of-court statement must be nearly contemporaneous with the incident described and made with little chance for reflection." *Bemis v. Edwards*, 45 F.3d 1369, 1372 (9th Cir. 1995). Variations on this theme abound in other jurisdictions as well. *See, e.g., United States v. Green*, 556 F.3d 151, 157 (3d Cir. 2009) (holding that reflection upon the events in question "fatally disqualifies" declarations for admission under the present sense impression exception); *Lovato*, 950 F.3d at 1343–45; *United States v. Ramos*, 397 F. App'x 767, 770–71 (3d Cir.

(continued . . .)

## B. *Admitting the 911 Call Was an Abuse of Discretion*

¶84 Despite the agreements with the majority that I lay out above, this is a dissent for a reason. Even though I largely agree with the majority's proffered framework, I simply cannot agree with its application. The majority's application of the factors identified to the facts of this case allows hearsay in that falls squarely outside of the present sense impression exception. The analytical framework the majority lays out can, in my view, only lead to one conclusion: there was adequate time for reflective thought before Sandoval mentioned a gun. As I explain below, the reference to a gun occurred at least four minutes after Johnson had driven away, more than two minutes into the call itself, and after a thirty second pause in the conversation. These disruptive blocks of time, in context, indicate that Sandoval had time to reflect on the event before stating that there was a gun. And when the timing of these statements is considered alongside their lack of spontaneity it's even more clear that Sandoval had adequate time for reflective thought. Indeed, Sandoval brought up the gun for the first time after a thirty second

---

2010) (noting that the present sense impression exception requires that "the declarant had no chance to reflect—that is, no time to fabricate or misrepresent his thoughts." (citation omitted)); *Booth v. State*, 508 A.2d 976, 981 (Md. 1986) (noting that the "appropriate inquiry is whether, considering the surrounding circumstances, sufficient time elapsed to have permitted reflective thought"); *Hallums*, 841 A.2d at 1278 ("With reflection[,] some reliability, which goes to the very essence of the present sense impression hearsay exception, is lost." (alteration in original) (quoting *United States v. Hamilton*, 948 F. Supp. 635, 639 (W.D. Ky. 1996)); *United States v. Narciso*, 446 F. Supp. 252, 288 (E.D. Mich. 1977) ("[T]he applicability of [the present sense impression] exception hinges on an absence of time for the declarant to reflect on what happened."); *People v. Vasquez*, 670 N.E.2d 1328, 1334 (N.Y. 1996) (noting that the "essential assurance of reliability" is "the absence of time for reflection"); *Davis v. State*, 133 P.3d 719, 728–29 (Alaska Ct. App. 2006) ("[T]he issue is not the exact amount of time between the event and the statement. Rather, the issue is whether, under the circumstances of the particular case, the interval between the event and the statement gave the speaker a significant opportunity to reflect on what he or she should say. If so, then the hearsay statement does not qualify for admission under the present sense impression exception.").

pause in the conversation and only in response to targeted and leading questions from the dispatcher.

¶85 As such, Sandoval's statements about the gun were simply not a present sense impression but rather the result of reflection and recollection. Having been asked to consider the admissibility of the call in its entirety, I believe it to be inadmissible to the extent that it contains these references to a gun. To hold otherwise warps the text of the rule and the theory of reliability animating the exception.

1. The Passage of Time Between the Events and the Statements in the 911 Call Referencing a Gun, When Considered in Context, Was Long Enough to Allow Reflective Thought

¶86 The "immediately after" language in the rule recognizes that a statement need not be made at the precise moment something is happening to be included in the exception; "some allowance must be made for the time needed for translating observation into speech." McCORMICK ON EVIDENCE § 271. But the slight allowance must be short. When analyzing evidentiary rules, we're bound to analyze the plain text to determine the intent. *See Rothlisberger*, 2006 UT 49, ¶¶ 15, 21; *State v. Vargas*, 2001 UT 5, ¶ 31, 20 P.3d 271. The term "immediately" is often defined as "[o]ccurring without delay" and "instant." *Immediate*, BLACK'S LAW DICTIONARY (11th ed. 2019); *see also Immediately*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/immediately (last visited Feb. 21, 2022) (defining "immediately" as "without interval of time"). The plain language of the rule doesn't allow declarations to qualify as present sense impressions when there has been any significant delay or passage of time, because the rule and the rationale don't allow statements that are the result of reflective thought or remembering. After all, the predicate of reliability stems from the contemporaneity between the perception and the statement.

¶87 Courts in other jurisdictions have not been able to identify a per se time limit for present sense impressions—a specific moment where a statement goes from being "immediately after" to not—and I don't believe we should do so either. Instead, we must return to the inquiry laid out above and in the majority opinion: whether sufficient time elapsed to permit reflective thought. In this context, we should instruct courts to analyze the elapsed time to consider, under the circumstances and in context with all relevant facts, whether or not it was sufficient to permit reflective thought on the part of the declarant.

¶88 In the present case, the 911 call was initiated by Sandoval and his assistant "a 'couple minutes'" after "Johnson and his girlfriend drove away," and the statement concerning a gun was made more than two minutes into the call. *Supra* ¶ 9–10. A lot happened in this time period between the actual altercation with Johnson and Sandoval's reference to a gun. Sandoval and his assistant went back into the office. They locked the door and called 911 (for the third time). They spent a minute on the phone talking to the dispatcher about their address and telephone number. And most importantly, during the call itself there were several breaks, including a thirty second break that included stretches of silence and an inaudible conversation between Sandoval and his assistant. These lapses in time between the event and Sandoval's reference to a gun exceed, at minimum, four minutes.

¶89 It's simply not correct to say that Sandoval didn't have adequate time for reflective thought, or calculated deception, before answering the 911 dispatcher's questions about a weapon. Certainly, much can occur in the thirty-second pause in the conversation. And much can occur in the four minutes (or, possibly, more) that passed between Sandoval's incident with Johnson and his reporting of the gun to the 911 dispatcher. Keep in mind that the world record for the men's 100-meter dash is 9.58 seconds. *100 Metres Men*, World Athletics, https://www.worldathletics.org/records/all-time-toplists/sprints/100-metres/outdoor/men/senior (last visited Dec. 1, 2021). Lucas Etter can solve a Rubik's cube in less than five seconds. *Lucas Etter*, World Cube Ass'n, https://www.worldcubeassociation.org/persons/2011ETTE01 (last visited Feb. 21, 2022). And the iconic McDonald's jingle is three seconds. You could effectively annoy anyone by playing it eighty times — the amount you can fit in four minutes. The time period between when Sandoval observed Johnson and when he answered the 911 dispatcher's questions about the weapon is sufficient for any of these things to happen, and it was clearly sufficient time to allow reflective thought or calculated deception.

¶90 To be clear, I'm not advocating for any per-se time limit, or categorical cut-off for when a statement will be admissible versus inadmissible under the exception. I make the points above to make clear that a lot can happen in even a short period of time, and that the longer the time period, the less likely the statement occurred without reflective thought. *See supra* ¶ 38. I don't mean to suggest that every statement made four minutes after the declarant's initial

perception will automatically be excluded from this exception. It will, of course, come down to the context.

¶91 I take issue with how the majority justifies its conclusion that the passage of time in this case was brief enough for the statements to qualify as a present sense impression. Primarily, I take issue with its emphasis on the "common usage of the phrase 'immediately after.'"[101] *Supra* ¶ 35. I disagree, and I don't believe the majority's points on "common usage" to be helpful or persuasive in this context.

¶92 When interpreting a statute or an evidentiary rule, we take a plain language approach, and we assume the language used was intended to be "construed in accordance with the ordinary meaning such words would have to a reasonable person familiar with the usage and *context* of the language in question." *Olson v. Eagle Mountain City*, 2011 UT 10, ¶ 9, 248 P.3d 465 (emphasis added). The majority's arguments about the "common usage" of "immediately after" attempt to take the use of the phrase in one context and apply it to another. The majority gives multiple examples of when one might say "immediately after" to refer to something that really occurred four or more minutes after. *See supra* ¶¶ 35, 35 nn.46–47. I find this unhelpful. Besides contravening dictionary definitions of

---

[101] The majority states that "[w]e would have to ignore common usage of the phrase 'immediately after' to interpret the rule as categorically prohibiting a statement whenever just a few minutes lapse between the observation and the statement." *Supra* ¶ 35 (emphasis omitted). I find it prudent to clarify that I am not suggesting such an interpretation of immediately after. I explicitly am "not advocating for any per-se time limit, or categorical cut off for when a statement will be admissible versus inadmissible under the exception." *Supra* ¶ 90. And "I don't mean to suggest that every statement made four minutes after the declarant's initial perception will automatically be excluded from the exception." *Supra* ¶ 90. It all comes down to the context. And in context, when coupled with the analysis I propose under the spontaneity factor, *see infra* ¶¶ 96–100, the timing in this case weighs against admission of the 911 call because the latter part of it was clearly made with adequate time for reflective thought. But not every statement made four minutes after the perception will warrant the same holding, thus the need to give district courts relevant factors to consider when analyzing a statement.

"immediately," the majority's reasoning ignores the context of the rule. When interpreting an evidentiary rule, we must construe the language in context. *See Olson*, 2011 UT 10, ¶ 9. So when analyzing what "immediately after" means in rule 803(1), we have to contextualize the word within the relevant inquiry.

¶93 Here, the relevant inquiry is whether or not there was time for reflective thought such that the statements could still be considered *present* sense impressions. In the examples used by the majority, the phrase "immediately after" is used to describe the general *sequence* of events, not the amount of time that has transpired *in between* events. For example, when I tell my wife that "dinner was served immediately after the ceremony," *supra* ¶ 35, I'm not telling her this because she asked whether there was any delay or time for reflective thought between the two events, or to make clear to her that dinner was instantly placed in front of me as the ceremony ended.[102] I'm telling her to give a general sequence of how the events of the night proceeded. In situations like this, sure, "immediately after" may be used to describe things happening many minutes after something else, and no one but an insufferable linguistic snob would correct the speaker on such usage. But this is because in these situations the issue of contemporaneity isn't at play and, quite frankly, the timing isn't very important. But in the hearsay context, when contemporaneity is the predicate of reliability, we ought to be more precise with our language.[103]

---

[102] In fact, if my wife *did* ask me "was there any delay or pause of time between the ceremony and dinner?" or "how much time passed between the ceremony and dinner?" I certainly would not say "dinner was served immediately after the ceremony" when it was actually served several minutes later because, in the context of her question, my use of the phrase immediately after would be both misleading and incorrect.

[103] Another example: the majority states that "a basketball player's postgame interview may accurately be said to have begun 'immediately after the game' even if it did not start until four minutes after the game clock hit zero." *Supra* ¶ 35 (footnote omitted). Sure, no one will correct the speaker on such usage when generally describing the loose sequence of events. But it's different in the context of the present sense impression. As one evidence treatise explains:

(continued . . .)

¶94 Ultimately, the majority's application of this factor undercuts the theory of reliability animating the present sense impression exception by allowing time for reflection and, potentially, deception. The reliability of present sense impressions is predicated on the substantial contemporaneity of event and statement, and when the contemporaneity is gone, so is the assumption of reliability. "It is the immediacy that gives the statement some credibility; the declarant has not had time to dissemble or embellish." *Navarette v. California*, 572 U.S. 393, 408 (2014) (Scalia, J., dissenting); *see also United States v. Manfre*, 368 F.3d 832, 840 (8th Cir. 2004) (explaining that the exception shouldn't be expanded "to cover a declarant's relatively recent memories" because "[t]he opportunity for strategic modification undercuts the [statement's] reliability").[104]

---

> If you turn on your radio during a baseball game, you will be inundated by present sense impressions. The utterances of the sportscaster describing and explaining what he observes on the playing field as it is taking place are quintessential present sense impressions. But the sportscaster's between-innings or post-game analysis would not qualify for this hearsay exception, for lack of contemporaneity.

DAVID F. BINDER, HEARSAY HANDBOOK § 8.1 (4th ed.).

[104] I also note that the likelihood of deception isn't necessarily minimized by the context of a 911 call. Not every 911 call is fully honest and accurate; emergency responders across the nation deal with false 911 calls often. One common occurrence is exaggerated 911 calls, where "callers intentionally exaggerate the seriousness of an emergency to get a quicker police response." RANA SAMPSON, U.S. DEP'T OF JUSTICE OFF. OF CMTY. ORIENTED POLICING SERVS., MISUSE AND ABUSE OF 911, at 6 (2004), https://popcenter.asu.edu/sites/default/files/misuse_abuse_of_911.pdf. Callers may falsely report "shots fired" when calling about a dispute. *Id.* They may tell 911 dispatchers that they saw more weapons than they did because they think it will "make the police respond more quickly." *See United States v. Davis*, 577 F.3d 660, 664 (6th Cir. 2009). They may have an argument with their roommate, call 911, and falsely claim that their roommate is wielding a gun. *See Sacramento County Dispatch Frustrated with Exaggerated 911 Calls*, KCRA NEWS (Oct. 14, 2016, 12:18 AM),

(continued . . .)

¶95 In short, I believe that the statements about a gun weren't made "while or immediately after" Sandoval's perception of the event.[105] This is part of the reason I believe the call was improperly

---

https://www.kcra.com/article/sacramento-county-dispatch-frustrated-with-exaggerated-911-calls/5985213. They might swear to see a gun while on the phone with the dispatcher, but later admit they saw no such thing. *Id.* To be clear, I'm not suggesting a finding that Sandoval lied to the 911 dispatcher, but I use these examples to make clear that the fact that this statement was made during a 911 call doesn't guarantee its reliability, and that the rationale of the present sense impression exception—requiring contemporaneity and immediacy to guarantee the truthfulness of the statement—applies in this context just the same as any other hearsay context. And it mandates the conclusion that too much time passed before the statement's regarding a gun in this case, and that time allowed reflective thought.

[105] I recognize that the majority points to federal cases where the courts let in statements made many minutes after the declarants actually perceived the event or condition. But, as the majority itself points out, these cases don't provide any bright line rule or precise time limit, and the courts come to their conclusions by looking to the rationale behind the exception and the facts of each particular case. And so, just because a court finds a 911 call made five minutes after an event to be admissible in one context doesn't mean that all 911 calls made within five minutes are, automatically, admissible.

For example, a court might find a two-minute delay to be acceptable when the statement is completely spontaneous and there are no intervening events. But in another case, the same court might find a two-minute delay to be unacceptable if the declarant was explicitly asked to spend two minutes reflecting on what they just saw before answering questions about it. So the context and the facts of each case matter immensely, and federal cases admitting statements made three, five, or seven minutes after an event should not be read as ruling that every statement made three, five, or seven minutes later will be admissible.

Still, I concede that the majority of federal courts seem to interpret the "immediately after" language more liberally than I do. But I believe these interpretations to be unpersuasive and impermissibly broad. I'm not alone in that view. *See, e.g.,* Douglas D. McFarland, *Present Sense Impressions Cannot Live In the Past*, 28 FLA.

(continued . . .)

admitted. But my conclusion is bolstered by looking at the third factor that the majority aptly recognizes as relevant: the spontaneity.

## 2. The Statements in the 911 Call Regarding a Gun Weren't Spontaneous

¶96 Present sense impressions are commonly referred to as "spontaneous" statements. *See, e.g., Lust v. Sealy, Inc.*, 383 F.3d 580, 588 (7th Cir. 2004); *United States v. Chavez*, 481 F.3d 1274, 1275 (10th Cir. 2007).[106] The federal advisory note to Rule 803 states, and the

---

ST. U. L. REV. 907 (2001); *United States v. Boyce*, 742 F.3d 792, 800 (7th Cir. 2014) (Posner, J., concurring) (criticizing the interpretation of "immediacy" to encompass periods of 23, 16, and 10 minutes); *Vasquez*, 670 N.E.2d at 1333-34 (explaining that the immediately after language was "not intended to suggest that declarations can qualify as present sense impressions even when they are made after the event being described has concluded," and that to be admissible under the exception statements must reflect "a *present* sense impression rather than a recalled or recast description of events that were observed in the recent past." "Without satisfaction of this requirement, the essential assurance of reliability" is "negated"); *cf.* Franci Neely Beck, *The Present Sense Impression*, 56 TEX. L. REV. 1053, 1062 (1978) ("The present sense impression exception should encompass those statements made *immediately* after the event, occurrence, or condition eliciting comment. If 'immediately' is liberally interpreted, however, the rationale of the present sense impression exception will be vitiated."). And while it may be tempting to seek uniformity with the majority of federal courts on this issue, there is nothing admirable about being uniformly wrong. The majority opinion relies too heavily, in my view, on this federal case law, which isn't binding on us, and which isn't persuasive when considering the text and the theory of the rule.

[106] Many evidence treatises also refer to present sense impressions as one of the "spontaneous statement" exceptions. McCormick on Evidence, for example, includes present sense impressions in Chapter 26, entitled "Spontaneous Statements." MCCORMICK ON EVIDENCE § 271. Paul F. Rothstein's Federal Rules of Evidence treatise labels present sense impressions and excited utterances as "relatively spontaneous statements." ROTHSTEIN, FEDERAL RULES OF EVIDENCE, art. VIII (3d ed. 2021). Jones on Evidence discusses the two exceptions under a chapter called

(continued . . .)

majority opinion recognizes, that spontaneity is the "key factor" to the present sense impression exception and its reliability. FED. R. EVID. 803 advisory committee note to paragraphs (1) and (2); *supra* ¶ 45. The majority's cited dictionary defines spontaneous as "[h]appening or arising without apparent external cause; self-generated" and "[a]rising from a natural inclination or impulse and not from forethought or prompting." *See Spontaneous*, AM. HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE, https://www.ahdictionary.com/word/search.html?q=spontaneous (last visited Feb. 21, 2022); *supra* ¶ 44 n.61. Others define the term as "arising from a momentary impulse," "developing or occurring without apparent external influence, force, [or] cause," and "not apparently contrived or manipulated." *Spontaneous*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/spontaneous (last visited Feb. 21, 2022). And according to Black's Law Dictionary, a spontaneous statement is "[a] statement that was [not] elicited, induced, provoked, or even encouraged."[107] *Statement*, BLACK'S LAW DICTIONARY (11th ed. 2019).

¶97 The majority notes that a hearsay statement need not be entirely self-generated in order to be admitted as a present sense impression, but that spontaneity is "a relevant factor in determining whether there was an opportunity for reflection long enough to undermine a statement's reliability." *Supra* ¶ 46. Once again, I agree, but disagree with the application and analysis of that factor to

---

"Spontaneous Statements." CLIFFORD S. FISHMAN & ANNE T. MCKENNA, JONES ON EVIDENCE § 28 (7th ed. 2020).

[107] The current edition of Black's Law Dictionary contains a scrivener's error, and actually defines spontaneous statement as its opposite: "[a] statement that was elicited, induced, provoked, or even encouraged." *Statement*, BLACK'S LAW DICTIONARY (11th ed. 2019). The error in this is clear. And past versions of Black's Law Dictionary define "spontaneous declaration" as "[a] statement that is made without time to reflect or fabricate and is related to the circumstances of the perceived occurrence." *Spontaneous Declaration*, BLACK'S LAW DICTIONARY (9th ed. 2009); *see also Spontaneous Declaration*, BLACK'S LAW DICTIONARY (8th ed. 2004). These versions note that "spontaneous declaration" is also termed "spontaneous statement," and then direct readers to also see the definition for "present sense impression." *Id.*

Johnson's case. I don't believe that the majority's opinion fully grapples with the importance of spontaneity in regards to prompting or leading questions and how that affects the analysis in this particular case.

¶98 At risk of stating the obvious, a present sense impression must be both present sense and an "impression." An impression is a "declarant's *initial, unstudied reaction* to the event or fact presented to the declarant's senses." Edward J. Imwinkelreid, *The Need to Resurrect the Present Sense Impression Hearsay Exception: A Relapse in Hearsay Policy*, 52 How. L.J. 319, 345 (2009) (emphasis added) (footnotes omitted). A present sense impression must not be the product of reflective thought and must not be a recollection or a memory of what has happened in the past. "The basic need" in the present sense impression exception is "a communication that reflects a *present* sense impression rather than a recalled or recast description of events that were observed in the recent past." *People v. Vasquez*, 670 N.E.2d 1328, 1334 (N.Y. 1996). And "care must be taken to ensure" that the "exception is not used to admit statements that circumstances reveal were not truly spontaneous, but instead involved conscious reflection or recall from memory." *Hallums*, 841 A.2d at 1277. As the Seventh Circuit has recognized, "answering questions rather than giving a spontaneous narration could increase the chances that the statements were made with calculated narration." *United States v. Boyce*, 742 F.3d 792, 797–98 (7th Cir. 2014); *see also United States v. Green*, 556 F.3d 151, 157 (3d Cir. 2009) (indicating that a statement made after the declarant "was expressly asked to reflect upon the events in question" was disqualified from "admission as a present-sense impression"); *Edwards v. State*, 736 So. 2d 475, 478 (Miss. Ct. App. 1999).

¶99 The transcript and recording of the call in the present case clearly indicate that Sandoval's statements about a gun weren't spontaneous but rather only in response to the dispatcher's questions, which prompted him to talk about a weapon. Sandoval had ample opportunity to bring up a gun spontaneously. The 911 operator asked him to "tell [her] exactly what happened." He didn't mention a gun in his response. She then asked him for clarification of his story. Still, he didn't mention a gun in his response. Over the next thirty seconds, there were several pauses in the conversation, there was silence, and there was an inaudible conversation between Sandoval and his assistant. But at no point did Sandoval bring up any gun or weapon. It wasn't until after the significant pause in the conversation that the dispatcher asked Sandoval specifically whether

any weapons were involved or mentioned. Only then does Sandoval mention a gun, and it's only in response to another specific question that he says what type of gun.

¶100 To be clear, I agree with the majority that the 911 call itself was made spontaneously, and that "a person 'can still make statements without calculated narration even if made in responses to questions.'" *Supra* ¶ 47 (citation omitted). And I don't mean to suggest that a statement must be "entirely self-generated in order to be admitted as a present sense impression." *Supra* ¶ 46. For instance, I believe that although the first half of the call was made in response to three questions from the dispatcher, the statements were sufficiently spontaneous and self-generating to indicate that there was not reflective thought. But I can't agree with the majority that the same is true of the second portion of the call. When an individual has ample opportunity to make a statement spontaneously but doesn't, and then makes the statement after a significant pause and in response to a leading question[108], it can't fairly be said that the statement was made without adequate time for reflective thought. And it can't fairly be said that the statement was a present sense impression.

---

[108] The majority takes issue with my use of the term "leading question," and cites a definition of leading question to make the point that the 911 dispatcher's question doesn't qualify as one. *See supra* ¶ 49 n.73. But the majority misses the point.

I don't use the term "leading question" to suggest that the 911 dispatcher was asking an impermissible question under the rules of evidence. *See supra* ¶ 49 n.73. Instead, I'm using it to illustrate that the question was "leading" Sandoval to reflective thought, to listen to her question and then reflect on the event in order to answer it.

Because of this, the issue here isn't whether the 911 dispatcher's question technically fits into a dictionary definition of "leading question." Instead, the issue is whether the question planted the seed or the thought in Sandoval's mind, making his response not a spontaneous blurt-out but the product of reflective thought. Sandoval had ample opportunity to talk about or mention a gun earlier in the call, but didn't do so until the dispatcher explicitly asked about weapons. Whether or not the question technically qualifies under the rules as a leading one is, honestly, beside the point.

3. Considering the Time Lapse with the Lack of Spontaneity, Admitting the Call Was an Abuse of Discretion

¶101 Considering the framework and factors that the majority itself identifies, admitting the 911 call was an abuse of discretion. We review a district court's decision to admit or exclude evidence under an abuse of discretion standard. And it is well settled that a "district court abuses its discretion when it admits or excludes evidence under the wrong legal standard." *State v. Richins*, 2021 UT 50, ¶ 39, 496 P.3d 158 (citation omitted) (internal quotation marks omitted); *see also, e.g., Johnson v. Johnson*, 2014 UT 21, ¶ 24, 330 P.3d 704 ("[T]he district court applied the wrong legal standard, and in so doing, abused its discretion."); *State v. Lowther*, 2017 UT 34, ¶ 17, 398 P.3d 1032. This rule is not unique to Utah. Indeed, there are hundreds of cases across the federal courts and other state courts saying the same thing. *See, e.g., Glock v. Glock, Inc.*, 797 F.3d 1002, 1006 (11th Cir. 2015) ("A district court abuses its discretion if it applies an incorrect legal standard . . . ." (citation omitted)); *United States v. Emmett*, 749 F.3d 817, 819 (9th Cir. 2014) ("It is an abuse of discretion to apply the wrong legal standard."). This is the case even when the district court's application of the wrong legal standard is totally understandable in light of the prior guidance (or lack thereof) from this court. *See, e.g., State v. Cuttler*, 2015 UT 95, ¶ 2, 367 P.3d 981 ("[T]he district court's adherence [to the wrong standard] is understandable given our prior pronouncements on this subject, [but] it nevertheless represents an application of the wrong legal standard and, therefore, an abuse of discretion."); *In re Cray, Inc.*, 871 F.3d 1355, 1360 (Fed. Cir. 2017) ("Although the law was unclear and the error understandable, the district court abused its discretion by applying an incorrect legal standard, which we now clarify in this opinion."); *Lowther*, 2017 UT 34, ¶ 45 n.81.

¶102 Whether the district court applied the correct legal standard is a question of law that is reviewed for correctness. *State v. Alonzo Peraza*, 2020 UT 48, ¶ 33 n.6, 469 P.3d 1023. And if "the trial court did apply the correct legal standard, a reviewing court will reverse its decision to admit or exclude [evidence] only if the decision exceeds the limits of reasonability." *Id.* (citation omitted) (internal quotation marks omitted).

¶103 This court has never before addressed the present sense impression head-on, nor articulated the legal standard for the exception under the Utah Rules of Evidence. But, having done so, it's now clear that the trial court didn't apply the correct legal standard of whether there was adequate time for reflective thought. Applying

the standard to the facts of this case requires consideration of the timing—specifically the lapses of time within the call—and the spontaneity of Sandoval's statements regarding a gun. The trial court's ruling doesn't comport with this analysis. The court first found that the statements were "substantially contemporaneous" with the underlying events, which is clearly the incorrect standard. And although the court also noted that the statements were made "as the declarant perceived them or immediately thereafter," citing the text of the rule, the court's finding of "substantial[] contemporane[ity]" and its failure to grapple with key factors in order to determine whether there was adequate time for reflective thought make clear that the incorrect standard was applied. The trial court's use of the wrong standard is, of course, understandable, given that this court has never before provided guidance on this exception. But it "nevertheless represents an application of the wrong legal standard and, therefore, an abuse of discretion." *Cuttler*, 2015 UT 95, ¶ 2; *see also Lowther*, 2017 UT 34, ¶ 45 n.81; *supra* ¶ 101.

¶104 In any event, even if I were to find that the trial court applied the correct standard, I would still reverse because the trial court's decision exceeded the limits of reasonability, even under our deferential standard of review. Considering the relevant inquiry, whether adequate time passed to have permitted reflective thought, and the factors identified by the majority as relevant in the analysis, I simply cannot conclude that the second portion of the 911 call was reasonably admitted. To say that the statement must be while or immediately after, and that courts should consider as potentially relevant the timing, the circumstances, and the spontaneity of the statement, and then to hold as the majority does is inconsistent. Sandoval made the statements about a gun at least four minutes after Johnson drove away. And, more importantly, he actually didn't make them when he first spoke to the 911 dispatcher and explained what happened, and that they were still in danger. Despite having ample opportunity to tell the 911 operator "exactly what happened," as she asked, he did not bring up any weapon. But after a thirty second pause in the call, which notably included not only stretches of silence but also an inaudible conversation between Sandoval and his assistant, Sandoval finally brought up a gun not spontaneously, but in response to the dispatcher's question "were weapons involved or mentioned?" Such statements cannot be considered present sense impressions, even assuming that the district court applied the correct standard and applying our deferential standard of review. And so,

the trial court abused its discretion by admitting the 911 call in its entirety, which included the statements about a gun.

¶105 Given all I have explained above, it should come as no surprise that I disagree that "this case presents a close call." *Supra* ¶ 24. But, I do not necessarily fault the district court judge. There is a wealth of conflicting jurisprudence across the nation regarding the present sense impression exception. And our court has never addressed the exception head on, only once in passing. *See State v. Smith*, 909 P.2d 236, 240 (Utah 1995) (saying that a statement must be "strictly contemporaneous" to qualify as a present sense impression). But today, the majority articulates the correct standard for trial courts to apply when considering this exception, and the factors that may be relevant to that analysis. I believe the majority then undermines its thoughtful explanation of this analysis through its application to these facts, allowing in Sandoval's statements about an alleged gun. But correct *articulation* of the standard *and application* of it to facts are essential in a case such as this, which will likely be the only guiding case law from our court on this exception for some time. My fear is that the application set forth in the majority opinion, and the ultimate holding, expands the exception beyond its text and purpose, undermines our rule against hearsay, and sets a bad precedent for future cases. This hurts Johnson, who was prejudiced by this error. *See infra* ¶¶ 106–110. And it paves the way for more and more hearsay statements to be admitted into evidence, even if made minutes after the declarant's perception and completely lacking spontaneity. And if such a case came before us again, we may find our hands tied by the abuse of discretion standard of review and our holding in this case. In sum, I believe the majority errs in its application and ultimate holding, and I am concerned about the precedent this case sets.

## II. PREJUDICE

¶106 I believe it was error for the trial court to admit the 911 call as a present sense impression. Unlike the majority, then, I would reach the issue of prejudice, and I ultimately conclude that Johnson was prejudiced by this error.

¶107 "Any error, defect, irregularity or variance which does not affect the substantial rights of a party shall be disregarded." Utah R. Crim. P. 30(a). Therefore, an error is prejudicial if "absent the error, there was a reasonable likelihood of a result more favorable to the accused." *State v. Bell*, 770 P.2d 100, 106 (Utah 1988). In other words, prejudice requires an error that likely led to a less favorable result for

the defendant—it's an erosion of our confidence in the case outcome. *See State v. Knight*, 734 P.2d 913, 919–21 (Utah 1987).

¶108 In the case before us, Johnson was charged with aggravated robbery. However, three of the four people present testified that there was no gun or that they never saw a gun and that a gun was never mentioned during the altercation. No gun or magazine was ever found. Only Sandoval testified that Johnson threatened to use a gun and that he saw such a gun. "There was no physical evidence of" a gun and "no testimony directly supporting [the manager's] account." *See State v. Bujan*, 2006 UT App 322, ¶ 32, 142 P.3d 581.

¶109 But, the presence of a gun significantly impacted Johnson's charge and subsequent sentencing. The jury could have found Johnson guilty of either robbery or aggravated robbery, and the gun was the sole evidentiary piece aggravating the charge. Utah's state sentencing statutes are indeterminate; robbery is one to fifteen years, while aggravated robbery is five years to life imprisonment. *See* UTAH CODE §§ 76-3-203; 76-6-301(3); 76-6-302(2). Johnson was sentenced to the latter because of a gun that three out of four parties never heard mentioned and never saw. The hearsay included in the 911 call "provided the only corroboration" of Sandoval's contention there was a gun, and "[a]s such," wasn't "harmless error." *Bujan*, 2006 UT App 322, ¶ 32.

¶110 The State clearly understood the importance of the 911 call, as it played it during witness questioning and its closing argument. The jury requested to listen to the call once more during deliberations, which they were allowed to do. The jury then found Johnson guilty of aggravated robbery. There's a reasonable likelihood that without the second portion of the 911 call admitted into evidence, the jury's verdict would be different. Based on these facts, I would find prejudice.

## CONCLUSION

¶111 The majority opinion, "applying the present sense exception to the facts of this case[,] profoundly distorts the exception and applies it far beyond the realm supported by its underlying rationale." *United States v. Orm Hieng*, 679 F.3d 1131, 1145 (9th Cir. 2012) (Berzon, J., concurring).

¶112 Perhaps the majority allows the call in because the emergency situation in which it was made heightens trust in it. Perhaps the call, considering the context, just seems sufficiently reliable. I believe there are likely good arguments that the stress of

the emergency situation undercut Sandoval's ability to modify his statements strategically, or simply that the statements have "equivalent circumstantial guarantees of trustworthiness." UTAH R. EVID. 807. But those arguments weren't made here because they aren't applicable to this exception. Those arguments would've been made if the State attempted to admit this statement under Utah Rule of Evidence 803(2), the excited utterance exception, or 807, the residual hearsay exception. But here, the exception the State chose to employ was 803(1), the present sense impression. And by approving the admission of the 911 call as a present sense impression, I believe the majority opinion is "bend[ing] seriously out of shape a hearsay exception grounded in precepts not here applicable." *Orm Hieng*, 679 F.3d at 1149.

¶113 This warping of the exception does a serious disservice to Johnson, who was prejudiced by this hearsay statement being allowed into evidence against him. But I also believe that in other cases, the majority's analysis could serve to broaden the exception even more and further undermine our hearsay rules. In cases where the declarant isn't available to testify at trial, for example, the analysis could be used to allow in hearsay made many minutes after the event or condition and prompted with a leading or prompting question even more egregious than the one at issue here. And then, if a case ever did come before us again asking us to analyze this exception, our hands would be bound by our abuse of discretion standard of review. It isn't hard to imagine how the allowance of prompted statements, made at least four minutes after the event or condition, could lead to broader and broader applications of the exception to cases with even more concerning facts. Accordingly, I dissent.

———————